IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **Michael Liggins**, | No. |
| Plaintiff, | |
| v. | |
| **City of Chicago, Det. Russell Egan,** and **Det. Vincent Alonzo**, | |
| Defendants. | Jury Trial Demanded |

## COMPLAINT

Now comes Plaintiff, Michael Liggins, by and through his attorneys, LOEVY & LOEVY, and complaining of the City of Chicago, Det. Russell Egan, and Det. Vincent Alonzo, and alleges as follows:

### Introduction

1. In 2014, Michael Liggins was wrongly arrested and charged with a murder that occurred almost six years earlier.

2. Mr. Liggins was innocent of the murder and had no knowledge of or involvement in the crime whatsoever.

3. Mr. Liggins's wrongful arrest, detention, and prosecution were the product of the Defendants' misconduct. The sum total of the evidence against Mr. Liggins was fabricated by the Defendants. They coerced a witness to falsely

identify Mr. Liggins and manipulated another witness into identifying him six years after the fact, despite the fact that Plaintiff did not match the description of the perpetrator.

4. At trial, the Defendants' scheme fell apart. Mr. Liggins was acquitted and finally freed after spending over five years imprisoned awaiting trial.

5. Mr. Liggins brings this suit to vindicate his rights, expose the Defendants' wrongdoing, and obtain redress for the immeasurable harm he suffered during more than five years of wrongful detention.

## Jurisdiction & Venue

6. This action is brought under 42 U.S.C. § 1983 and Illinois law to redress Defendants' tortious conduct and the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

7. This Court has jurisdiction under 28 U.S.C. § 1331 and § 1367. Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to this complaint occurred in this judicial district.

## Parties

8. Plaintiff Michael Liggins is a 30-year-old African American man and a lifelong resident of Chicago. He is currently employed as a quality assurance technician at Stampede Meats.

9. At all times relevant to the events described in this complaint, Defendants Egan and Alonzo were employed by the City of Chicago as police

officers with the Chicago Police Department, acting within the scope of their authority and under color of law.

10. Defendant City of Chicago is an Illinois municipal corporation that is or was the employer of each of the Police Officer Defendants. At all times relevant to the events described in this complaint, each of the individual Defendants acted as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by its employees and is responsible for the policies and practices of the Chicago Police Department.

### The Berthel Tucker Murder and Initial Investigation

11. On September 20, 2008, two men attempted to rob the Ramos Grocery Store on the west side of Chicago. During the course of the robbery, an employee of the store named Berthel Tucker was shot and killed.

12. The Ramos Grocery Store was a small establishment. Only two people were working there at the time of the shooting—the victim and the owner.

13. There were only a handful of witnesses to the shooting.

14. The offenders' faces were obscured by hoods covering their heads with the drawstrings pulled tight around their faces.

15. Immediately after the murder, witnesses described the offenders as two African American men about 5'11" and 5'9" in height. The shorter of the two men was described as having "big eyes."

3

16.  Mr. Liggins had nothing whatsoever to do with the crime. He stands at 6'3" feet tall.

17.  Ronald Ruff, a civilian who was present outside the store when the murder occurred, told police that he saw the offenders fleeing the scene.

18.  He also observed one of the offenders drop his cell phone on the street.

### Detectives Egan and Alonzo Elicit a
### False Identification from Jacob Tolbert

19.  On September 22, 2008, two days after the crime, a 19-year-old named Jacob Tolbert was arrested for an unrelated crime and brought into the 11th District.

20.  Tolbert was mentally disabled and had an eighth-grade education. He could neither read nor write and was under the influence of narcotics when he was arrested.

21.  Defendants Egan and Alonzo began questioning Tolbert about the Tucker homicide, feeding him details of the murder and eventually coercing him to falsely implicate Mr. Liggins in that murder.

22.  Tolbert's mental impairments were obvious to Defendants Egan and Alonzo.

23.  Tolbert told Defendants Egan and Alonzo that he did not know anything about the Tucker homicide, but Defendants promised him help on the incident for which he was arrested if he cooperated, and also promised him $2,500 in exchange for his assistance in implicating Mr. Liggins.

4

24. Egan and Alonzo then got Tolbert to pick out Mr. Liggins from a photo array.

25. Defendant Egan threatened Tolbert with false criminal charges if he did not cooperate and identify Mr. Liggins from the array.

26. On information and belief, although Defendant Alonzo was aware that Egan had wrongfully manipulated Tolbert's identification, he did not intervene to correct this fabrication or report Egan's wrongdoing.

27. Indeed, Defendants did not document any of their misconduct or the methods they used to coerce Tolbert to falsely implicate Mr. Liggins.

28. Tolbert's supposed identification was false. He had not been at the Ramos Grocery Store at the time of the murder, he did not know Michael Liggins, and he had no reason to believe that Mr. Liggins was involved in the crime.

29. Moreover, none of the officers who had been at the crime scene two days prior reported seeing Tolbert there, let alone interviewing him, and none of the actual witnesses to the crime reported seeing him (or anyone matching his description) in or around the small convenience store when Tucker was killed.

30. Mr. Liggins did not match the description of either perpetrator. At 6'3", he is much taller than average—four inches taller than one of the perpetrators and six inches taller than the other.

31. Less than two hours after Tolbert viewed the photo array, Defendants Egan and Alonzo went to the home of the owner of the Ramos Grocery Store to conduct another photo array procedure.

32. There was no reason for Defendants Egan and Alonzo to conduct this additional photo array procedure because they were not the detectives assigned to the Tucker murder investigation.

33. On information and belief, Defendants Egan and Alonzo reached an agreement among themselves to perform this additional photo array procedure to shore up Tolbert's identification, which they knew was false.

34. Upon viewing the same photo array that was presented to Tolbert, the grocery store owner was unable to make an identification.

35. Other than sharing their reports of the two identification procedures with the investigating detectives, Defendants Egan and Alonzo had no further involvement in the Tucker murder investigation for nearly six years.

### The Case Goes Cold

36. Upon learning about Tolbert's supposed identification of Mr. Liggins, the detectives assigned to the case investigated to determine if Liggins was the perpetrator.

37. Tolbert's unsupported statement and the fact that Mr. Liggins did not match the perpetrators' description led the assigned detectives to conclude that Mr. Liggins was not a legitimate suspect in the murder.

38. The assigned detectives never even contacted Mr. Liggins to question him about the case.

39. Having failed to generate any bona fide leads, the investigating detectives did not arrest anyone—including Michael Liggins—for Tucker's murder, and the case went cold.

## Six Years Later, Detectives Alonzo and Egan Miraculously Conjure Two New Identifications

40. In 2014, Egan and Alonzo returned to the sole piece of "evidence" they had generated during their brief involvement in the Tucker murder investigation six years prior: Tolbert's supposed identification of Mr. Liggins.

41. Egan and Alonzo began by locating Ronald Ruff, who told the police in 2008 that he witnessed the perpetrators fleeing the scene.

42. On April 13, 2014, almost six years after the murder, Egan and Alonzo asked Ruff to view a photo array that included a photo of Liggins.

43. Egan and Alonzo had no legitimate basis whatsoever to include Mr. Liggins's photo in the array.

44. Egan reported that Ruff identified Mr. Liggins as the person he saw running from the scene who dropped his cell phone on the ground.

45. It would have been impossible for Ruff to identify Mr. Liggins in the manner reported by Defendant Egan.

46. Specifically, Egan reported that Ruff identified a stranger he had seen only once before, more than six years earlier, for a matter of seconds, while the

individual (who was holding a gun and whom Ruff observed fumbling with a cell phone) rapidly fled the scene of the crime, with his face obscured by his hood for periods of time.

47. Dr. Geoffrey Loftus, an expert in human perception and memory, testified at Mr. Liggins's trial that the short time interval in which Ruff could have viewed the perpetrator, combined with other factors known to affect perception and memory, meant that Ruff's recollection of the perpetrator's face would have completely disappeared from his memory after just one year.

48. Dr. Loftus's testimony is supported by scientific evidence confirming that a long "retention interval" between the crime and the identification procedure yields an unreliable identification.

49. Moreover, as a matter of common sense and ordinary human experience, Defendants Egan and Alonzo knew that Ruff could not possibly make a reliable identification when they interviewed him in 2014.

50. Ruff was able to point out Mr. Liggins only because of deliberate, improper influence by Egan and/or Alonzo.

51. The Defendants then prepared a written statement with Ruff, in which Ruff noted that the man he identified as Mr. Liggins fleeing the crime scene was shorter than he was. Ruff is 5'11", and, at 6'3", Michael Liggins is more than four inches taller than Ruff.

52. The Defendants also had Ruff view a physical lineup, which they knew had no evidentiary value because Ruff had already been manipulated to identify Mr. Liggins. Under those circumstances, the physical lineup procedure was simply another fabrication designed to frame Mr. Liggins for the crime.

53. Defendants rigged the lineup to make Mr. Liggins stand out from the rest of the participants by making him wear a hooded sweatshirt.

54. Mr. Liggins was the only person in the lineup wearing a hooded sweatshirt, which was the attire worn by the perpetrator in the shooting.

55. Moreover, some of the other participants in the lineup did not resemble Mr. Liggins's appearance, making the lineup unduly suggestive.

56. If Ruff's supposed identification of Liggins in 2014 were not unlikely enough on its own, Egan and Alonzo then fabricated a *second* stranger identification from a photo array six years after the fact.

57. Defendants Egan and Alonzo determined that on the night of the murder a woman named Shannon Alexander had given a television interview about witnessing the crime but had never been interviewed by the police. The detectives discovered that Alexander was incarcerated at Logan Correctional Center.

58. The Defendants interviewed Alexander in custody and presented her with a photo array. Notwithstanding the scientific reality that Alexander was

incapable of making a reliable identification at that point, Egan reported that she picked out Liggins but refused to sign her name to his photograph.

59. This was false.

60. The reason Alexander's signature did not appear on Mr. Liggins's photograph is because she was unable to identify him. On information and belief, the Defendants fabricated her identification out of whole cloth.

61. On information and belief, Alexander did not identify anyone from the array because she told Defendants that the offenders she saw had their faces obscured by the hoods of their sweatshirts.

**Egan and Alonzo Obtain Another False Identification from Tolbert**

62. Having fabricated two identifications from Ruff and Alexander, the Defendants obtained a writ to bring Jacob Tolbert, then imprisoned at Dixon Correctional Center, to Area North headquarters for a second interview.

63. Once again, Tolbert was in police custody without his attorney present for the entirety of the interview.

64. This time, the Egan and Alonzo reported learning a number of key details from Tolbert that they had never previously mentioned. For example, Tolbert supposedly told the detectives that he knew Mr. Liggins from Orr High School and that Tolbert lived near the Ramos Grocery Store with his grandmother.

65. The Defendants reported that Tolbert once again identified Liggins from a photo array.

66. This identification, like Tolbert's last one, was false.

67. The information that Tolbert reportedly offered about his familiarity with Mr. Liggins and the Ramos Grocery Store in fact originated with Detective Egan.

68. Because the Defendants knew that Tolbert's identification of Liggins was false, they did not attempt to corroborate any of the details he had provided.

69. None of the photo arrays or lineups conducted during the Tucker murder investigation were performed according to CPD's written policies, which require the use of double-blind identification procedures.

70. Based on the fabricated identifications by Tolbert, Ruff, and Alexander, all of which were procured through the Defendants' willful misconduct, Michael Liggins was arrested in his home on May 13, 2014 and charged with first degree murder.

71. At no time did the Defendants have probable cause to arrest or detain Mr. Liggins for Tucker's murder.

### Liggins is Tried and Acquitted

72. Mr. Liggins sat in Cook County Jail for over five years awaiting trial. During that time, he was deprived of his freedom, torn away from his family and friends, prevented from working and earning income, and made to fear that he would spend the rest of his life behind bars as an innocent man.

73. The trial began in July 2019. The prosecutors called Tolbert, who testified truthfully that he had no knowledge of the crime or Michael Liggins's involvement. Tolbert also testified that he identified Mr. Liggins as the perpetrator only after Detective Egan pressured him to do so and fed him details of the crime.

74. On information and belief, before taking the stand, Alexander confirmed to prosecutors that she could not identify the perpetrator and had no idea whether Mr. Liggins was the perpetrator.

75. Alexander testified about the events surrounding the murder, but was never asked to identify Mr. Liggins, nor was any reference made to Defendants' fabricated claim that she had previously identified Liggins.

76. The only trial witness who identified Mr. Liggins as the perpetrator was Ruff, who maintained that he had successfully picked Mr. Liggins out of a photo array with a high degree of confidence six years after the fact, despite it being scientifically impossible for him to have done so.

77. Mr. Liggins presented the testimony of Dr. Loftus, which demonstrated that Ruff's identification, as reported by Egan and Alonzo, was inconsistent with the basic scientific principles governing memory and perception.

78. The jury returned a verdict of not guilty, and Michael Liggins became a free man for the first time in more than half a decade.

79. Although the jury's verdict spared Liggins decades of wrongful incarceration, he had already lost five years of his life to the Defendants' willful misconduct. The pain and suffering he experienced as a result is incalculable.

### The Chicago Police Department's Extensive History of Manipulating Eyewitness Identifications and Suppressing Evidence

80. The Chicago Police Department is responsible by virtue of its official policies for scores of miscarriages of justice like that inflicted upon Mr. Liggins.

81. Since 1986, no fewer than 70 cases have come to light in which Chicago Police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes that they did not commit.

82. These cases include many in which CPD officers used the same tactics that the Defendants used against Mr. Liggins in this case, including: (1) fabricating eyewitness identifications; (2) fabricating witness statements; (3) concealing exculpatory evidence; (4) manipulating witnesses in order to influence their testimony; and (5) using other tactics to secure the arrest and prosecution of a person without probable cause and without regard to the person's actual guilt or innocence.

83. At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements

implicating innocent persons, knowing full well that those statements were false. As a matter of widespread practice, members of the CPD, including the Defendants in this action, contrived false witness narratives that were fed to vulnerable witnesses, who then adopted those narratives as their own for the purpose of wrongly convicting an innocent person. In addition, CPD officers routinely fabricated and manipulated identification procedures to procure identifications of individuals that they knew to be inaccurate. Furthermore, CPD officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

84. The municipal policy and practice described in the preceding paragraphs was described in an FBI FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The report documents, among other things, that Chicago police detectives would feed information to witnesses and coach them through court-reported and handwritten statements, coerce witnesses into sticking to a detective's theory of the case, physically abuse witnesses, and work together to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories.

85. Consistent with the municipal policy and practice described in the preceding paragraphs, employees of the City of Chicago, including the named

Defendants, fabricated reports, witness identifications, and other evidence, which were used to wrongfully prosecute Mr. Liggins.

### CPD's Longstanding Failure to Discipline or Supervise its Officers

86. The City of Chicago and the Chicago Police Department routinely fail to investigate cases in which Chicago Police detectives manipulate witness identifications, fabricate evidence, and/or arrest or detain individuals without probable cause.

87. Before and during the period in which Mr. Liggins was unlawfully arrested, detained, and prosecuted for the Tucker homicide, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

88. In 2017, the U.S. Department of Justice issued a report finding that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, on the subject of training, the DOJ concluded that the "CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers

underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers are in need of help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result."

89. On the subject of supervision, the DOJ concluded among other things that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

90. The DOJ "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the DOJ

found that the City failed to investigate nearly half of misconduct complaints, and where investigations did occur, there were "consistent patterns of egregious investigative deficiencies." And where misconduct complaints are sustained, discipline is inconsistent and unpredictable.

91. With respect to the fabrication of evidence, the DOJ found that "[i]nvestigators do not diligently review the investigative records to determine whether witness officers have lied in police reports or whether supervisors have blindingly approved reports without attempting to determine whether the reports are fabricated."

92. Similarly, the Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority."

93. Between 2004 and 2016, the City paid more than $500 million in settlements or judgments in police misconduct discovery, without even conducting disciplinary investigations in more than half of the cases, and while recommending discipline in fewer than 4% of those cases.

94. Between 2011 and 2015, nearly half of complaints filed against Chicago police officers were not even investigated.

95. More than 95% of complaints against the Chicago police are found to be "unsustained."

96. Less than 2% of complaints against the Chicago police resulted in any discipline.

97. As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitate a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

98. The failure of police supervision and discipline in the City of Chicago during the relevant time period is a fact admitted by City policymakers and Chicago police officers.

99. Former Chicago Mayor Rahm Emanuel has acknowledged that a code of silence exists within the Chicago Police Department.

100. Former Interim CPD Superintendent Charlie Beck stated in January 2020, "[O]f course there's such a thing" as a code of silence within the CPD.

101. In December 2016, the President of the police officers' union in Chicago admitted that there is a code of silence in the CPD.

102. The code of silence in the Chicago Police Department has been longstanding.

103. In *Obrycka v. City of Chicago*, No. 07 C 2372 (N.D. Ill.), a federal jury found that, as of February 2007, "the City had a widespread custom and/or

practice of failing to investigate and/or discipline its officers and/or code of silence."

104. The same code of silence and ineffective system of police oversight were in place when Mr. Liggins's constitutional rights were violated from 2014 through 2019.

105. As a direct and proximate result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the CPD, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

### Count 1 – Due Process, Fourteenth Amendment
### 42 U.S.C. § 1983

106. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

107. As described in detail above, the Defendants, acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the

scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

108. In the manner described more fully above, Defendants manufactured evidence and solicited false evidence—including identifications, witness statements, and witness testimony that they knew to be false—from Alexander, Ruff, and Tolbert, among others. Defendants also fabricated police reports falsely implicating Plaintiff in the Tucker homicide.

109. The Defendants secured Mr. Liggins's prosecution using this knowingly false evidence, and they failed to correct these fabrications when the evidence was used against Mr. Liggins.

110. In addition, the Defendants deliberately withheld exculpatory evidence from state prosecutors, Mr. Liggins, and Mr. Liggins's criminal defense attorneys, including evidence that the Defendants had manufactured identifications and witness statements, thereby misleading and misdirecting the criminal prosecution of Mr. Liggins.

111. In addition, on information and belief, the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Mr. Liggins.

112. The Defendants' misconduct resulted in the unjust and wrongful criminal prosecution of Mr. Liggins and the deprivation of his liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment.

113. Absent this misconduct, the prosecution of Mr. Liggins could not and would not have been pursued.

114. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and in total disregard of the truth and Mr. Liggins's clear innocence.

115. As a result of the Defendants' misconduct described in this Count, Mr. Liggins suffered mental anguish, humiliation, degradation, physical and emotional pain and suffering, loss of liberty, and other grievous injuries and damages as set forth above.

116. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department as described more fully below in Count 5.

### Count 2 – Deprivation of Liberty, Fourth and Fourteenth Amendments 42 U.S.C. § 1983

117. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

118. In the manner described more fully above, the Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Mr. Liggins of criminal activity and exerted influence to initiate and perpetuate judicial proceedings against him without any probable cause for doing so and in spite of the fact that they

knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

119. In so doing, the Defendants caused Mr. Liggins to be deprived of his liberty without probable cause and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury to Mr. Liggins.

120. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and in total disregard of the truth and Mr. Liggins's clear innocence.

121. As a result of the Defendants' misconduct described in this Count, Mr. Liggins suffered mental anguish, humiliation, degradation, physical and emotional pain and suffering, loss of liberty, and other grievous injuries and damages as set forth above.

122. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department as described more fully below in Count 5.

### Count 3 – Conspiracy to Deprive Constitutional Rights
### 42 U.S.C. § 1983

123. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

124. In the manner described above, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among

themselves to fabricate evidence and to detain, prosecute, and convict Mr. Liggins for the Tucker homicide, regardless of Mr. Liggins's guilt or innocence, and thereby to deprive him of his constitutional rights.

125. In so doing, these co-conspirators agreed to accomplish an unlawful purpose through an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

126. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

127. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and in total disregard of the truth and Mr. Liggins's clear innocence.

128. As a result of the Defendants' misconduct described in this Count, Mr. Liggins suffered mental anguish, humiliation, degradation, physical and emotional pain and suffering, loss of liberty, and other grievous injuries and damages as set forth above.

### Count 4 – Failure to Intervene
### 42 U.S.C. § 1983

129. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

130. In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to

prevent the violation of Mr. Liggins's constitutional rights, even though they had the duty and the opportunity to do so.

131. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and in total disregard of the truth and Mr. Liggins's clear innocence.

132. As a result of the Defendants' misconduct described in this Count, Mr. Liggins suffered mental anguish, humiliation, degradation, physical and emotional pain and suffering, loss of liberty, and other grievous injuries and damages as set forth above.

133. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department as described more fully below in Count 5.

## Count 5 – *Monell*
## 42 U.S.C. § 1983

134. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

135. As described in detail above, the City of Chicago is liable for the violations of Mr. Liggins's constitutional rights because Mr. Liggins's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policymaking officials for the City of Chicago.

136. At all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread

practice and custom by officers and agents of the Chicago Police Department and the City of Chicago of manufacturing false evidence, suppressing evidence, and instigating false criminal charges.

137. In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals were routinely deprived of their right to due process. For example, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using coercion and/or manipulated photographic or live lineup procedures, as well as fabricated police reports.

138. Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which criminal suspects were denied due process in one or more of the following ways: (1) suspects were selected during identification procedures by eyewitnesses who had been instructed by police on which suspect to identify; (2) suspects were shown improperly suggestive photo arrays; (3) suspects were shown suggestive live lineups; (4) identification procedures were not accurately documented; and (5) supervisors with knowledge of permissible and impermissible identification

techniques did not properly supervise or discipline police officers and employees such that the fabricated and improper identifications continued unchecked.

139. In addition, at all relevant times and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago that included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements, reports, and testimony of witnesses; (3) officers fabricated evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions based on profoundly flawed investigations.

140. These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees and by failing to adequately punish and discipline prior instances of similar misconduct, thereby directly encouraging the abuses like the ones Mr. Liggins suffered.

141. These widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers exhibited deliberate indifference to the problem, thereby effectively ratifying it.

142. At all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures; conducting interrogations and questioning of witnesses and suspects; collecting, documenting, preserving, testing, and disclosing evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintaining investigative files and disclosing those files in criminal proceedings. In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago with respect to these subjects.

143. These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago.

144. As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly prosecuted and imprisoned for, as well as convicted of, crimes that they did not commit.

145. Mr. Liggins's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## Count 6 – Malicious Prosecution
## Illinois Law

146. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

147. In the manner described above, the Defendants, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Mr. Liggins of criminal activity and exerted influence to initiate and to initiate and perpetuate judicial proceedings against Mr. Liggins without any probable cause for doing so.

148. In so doing, the Defendants caused Mr. Liggins to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

149. The judicial proceedings were terminated in Mr. Liggins's favor and in a manner indicative of his innocence when he was acquitted in July 2019 following a criminal trial.

150. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and in total disregard of the truth and Mr. Liggins's clear innocence.

151. As a result of the Defendants' misconduct described in this Count, Mr. Liggins suffered mental anguish, humiliation, degradation, physical and emotional pain and suffering, loss of liberty, and other grievous injuries and damages as set forth above.

## Count 7 – Intentional Infliction of Emotional Distress
### Illinois Law

152. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

153. As described more fully above, the acts, omissions, and conduct of the Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Mr. Liggins.

154. As a result of the Defendants' misconduct described in this Count, Mr. Liggins suffered mental anguish, humiliation, degradation, physical and

emotional pain and suffering, loss of liberty, and other grievous injuries and damages as set forth above.

## Count 8 – Civil Conspiracy
### Illinois Law

155. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

156. As described more fully above, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Mr. Liggins for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose through unlawful means. The Defendants also reached an agreement among themselves to protect one another from liability for depriving Mr. Liggins of his rights.

157. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

158. The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Mr. Liggins and their intentional infliction of emotional distressed, were accomplished by the Defendants' conspiracy.

159. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and in total disregard of the truth and Mr. Liggins's clear innocence.

160. As a result of the Defendants' misconduct described in this Count, Mr. Liggins suffered mental anguish, humiliation, degradation, physical and

emotional pain and suffering, loss of liberty, and other grievous injuries and damages as set forth above.

## Count 9 – Respondeat Superior
### Illinois Law

161. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

162. While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, officers, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

163. Defendant City of Chicago is liable as principal for all torts committed by its agents.

## Count 10 – Indemnification
### Illinois Law

164. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

165. Illinois statute (745 ILCS 10/9-102) provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

166. The Defendants were employees, officers, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

167. The City of Chicago is responsible for paying any judgment entered against the Defendants. Plaintiff therefore demands judgment against Defendant City of Chicago in the amounts awarded to Plaintiff against the individual Defendants in the form of damages, attorneys' fees, costs, and interest.

## Prayer for Relief

WHEREFORE, Plaintiff Michael Liggins respectfully requests that this Court enter judgment in his favor against Defendants, awarding compensatory damages, punitive damages, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other relief the Court deems just and appropriate.

## Jury Demand

Plaintiff Michael Liggins demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

July 10, 2020                                 Respectfully submitted,

                                             /s/ John Hazinski
                                             *Attorney for Plaintiff Michael Liggins*

Arthur Loevy
Jon Loevy
Russell Ainsworth
John Hazinski
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, Illinois 60625
(312) 243-5900
(312) 243-5902 fax
hazinski@loevy.com